[Civ. No. 19635. Second Dist., Div. Three. Mar. 15, 1954.]

PURE FOODS CORPORATION (a Corporation), Appellant,
v. ROY G. VOGEL, Respondent.

Benjamin Chipkin for Appellant.

Morris Kastle for Respondent.

WOOD (Parker), J.—Action for damages for breach of contract. In a nonjury trial judgment was for defendant. Plaintiff appeals and contends that the findings and judgment are not supported by the evidence.

On August 16, 1950, plaintiff and defendant entered in a written agreement which recited in part: "I, Roy G. Vogel, agree to furnish the following to the buyer, Harold Fisch, representing Pure Foods Corporation: 15 Tons No. 3 Canning Grade Pears at $70.00 per ton 50 Tons Field Run Pears, if available, which will meet No. 3 Canning Grade Specifications, or better, at $100.00 per ton." The 15 tons of No. 3 pears were delivered to plaintiff and there is no issue as to that part of the contract. No part of the 50 tons of field run pears was delivered to plaintiff.. Plaintiff alleged that 50 tons of

field run pears were available. Defendant denied that allegation.

Finding IV was as follows: Defendant did not have available 50 tons or any other amount of field run pears at any time during the pear season of 1950. He did not in any manner repudiate said contract. He did not sell or deliver any field run pears to anyone during the season of 1950. He did not have available for sale and delivery, after signing the contract, any No. 3 canning grade pears except the 15 tons delivered to plaintiff. After the execution of the contract the only pears sold and delivered by defendant were No. 1 grade pears. It is not within the contemplation of the parties at the time the contract was signed that defendant would be required to deliver to plaintiff No. 1 grade pears in fulfillment thereof. All the pears picked by defendant after the execution of the agreement, except those which graded No. 1, had to be destroyed because they did not comply with the requirements as to grade under existing market orders.

Appellant asserts that at the time the contract was made the pears were still on the trees and the evidence clearly shows that the field run pears were available. Defendant (respondent) testified that field run pears are pears that come into the packing shed directly from the trees, have not been processed, and may include No. 1 and various other grades of pears; the amount of field run pears, which meet No. 3 canning grade specifications or better, is determined in the following manner: all the pears, of all sizes as picked from the trees, are brought into the packing shed from the orchard in field boxes and they are inspected, and those which are wormy, scratched, bruised or damaged are rejected and taken out, and the remainder (except the ones which are too small to be No. 3 grade—that is less than $2\frac{1}{8}$ inches in diameter) are field run pears that are of No. 3 canning grade or better. He also testified that during the pear season he had more than 50 tons of such field run pears in the shed—he had a total of approximately 190 tons; 32 tons of said total amount were No. 3 canning grade pears—15 tons of which were sold and delivered to plaintiff pursuant to the contract herein, and 17 tons were sold and delivered to Kern Food Products, Inc., pursuant to a written contract entered into between that company and defendant on July 26, 1950; about 40 tons of said total amount were not marketable; about 118 tons, the remainder of said total amount (except about 10 tons which

were sold to charitable organizations and itinerant merchants) were sent on consignment to three commission brokers pursuant to oral agreements to consign No. 1 pears to them, which agreements were made with them prior to making said contract with plaintiff; the three brokers were H & F Company, Osage Produce Company, and Frank Moyer; in May, 1950, defendant told a representative of the Osage Company that he thought he would have enough pears so that he could split the sales among the three brokers, and he told that representative to send some empty lug boxes to him; he told a representative of the H & F Company that he thought he could furnish 10,000 boxes of No. 1 pears to that company (a lug box contains about 23 pounds of pears); about August 10, before the marketing season of 1950 (which was August 12 to 18), he told Frank Moyer that he thought he would send to him on consignment about 12,000 boxes of No. 1 pears; the three brokers sent empty boxes to him for his use in delivering the pears to them; the H & F Company sent about 6,000 empty boxes to him in June and July, and during the marketing season he sent to that company about 3,000 boxes of No. 1 pears; he sent 2,266 boxes of such pears to the Osage Company; he sent 5,761 boxes of such pears to Frank Moyer during the marketing season; on May 11, 1950, in response to an inquiry by plaintiff, he sent a postal card to plaintiff stating that the pear crop was lighter than it was last year, however, he imagined that he could furnish about 50 tons, but he should know more in a few weeks; the average price he received for the pears he sent to said brokers was about $220 a ton; he did not ship any field run pears in the season of 1950, and he did not sell any such pears to anyone who came to the ranch. Defendant testified further that on August 16, 1950, the date when the contract herein was made, the market price of No. 1 pears was around $160 to $200 a ton and he knew at said time that that was the market value; defendant had sold pears to plaintiff over a period of several years; on August 16, 1950, Mr. Fisch, the representative of plaintiff, came to the packing shed and said he wanted fruit; defendant replied that he had a very short crop and he could not commit himself to any definite amount due to his prior commitments but he would do what he could; Fisch said that he had to have a definite amount of fruit; defendant then "agreed" to furnish 15 tons, and told him that he would furnish more if he had it but he had to take care of his prior commitments first; then Fisch "wanted it in writing"; they went to the office (in

defendant's home) and asked defendant's wife to typewrite the agreement; defendant and Fisch composed the agreement; Fisch insisted upon getting more than 15 tons; defendant told him that if he had the fruit available he would be willing to sell it to him; after the pears of the 1950 season were processed there were only two grades of pears—No. 1 and No. 3.

The wife of defendant testified in substance the same as defendant testified regarding the conversation between defendant and Fisch at the time the contract was made.

Representatives of the Osage Company and the H & F Company testified in substance the same as defendant testified with respect to (1) the defendant's commitments, made in May, to consign No. 1 pears to said companies, and (2) the quantity and quality of the pears sent by defendant to those companies during the marketing season.

Mr. Fisch, the secretary of plaintiff, testified that during the last few days of August, 1950, he called defendant by telephone and asked him about delivering the fruit; defendant replied that he did not have it; just before making the contract Fisch asked defendant how many tons he could sell; defendant replied that he was sure he could sell at least 15 tons of No. 3 pears; Fisch asked him how many tons of field run pears, which would meet No. 3 or better, he would try to give him; defendant replied he would make a contract for 50 tons at $100; Fisch then told him to write the contract; defendant said that he was not sure how many tons he would have, and he wanted to put in the words "if available"; Fisch said that he had no objection; then they signed the contract.

The words "if available," appearing in the contract should be given the meaning which the parties intended to give them at the time they made the contract. It cannot be said as a matter of law that such intention can be determined by reference solely to the provisions of the contract. As stated at the trial by counsel for appellant, the contract is ambiguous. It was proper to receive testimony as to the circumstances under which the contract was made and as to the conversation between defendant and Mr. Fisch at the time of making the contract.

Appellant argues to the effect that the words "if available" were intended to mean that field run pears of such specifications would be delivered to plaintiff if the orchard produced 50 tons of such pears; that defendant admitted that more than said amount had been produced; that even if defendant had

made prior commitments to consign No. 1 pears, the No. 1 pears were available for delivery to plaintiff because the pears which were to be consigned or were on consignment were still owned by defendant and he could have withdrawn them from consignment; that even if there were no marketable pears of a lower grade than No. 1, the No. 1 pears should have been used to comply with the agreement to furnish "field run pears."

■ Whether the field run pears were available was a question of fact for the determination of the trial judge. Also, whether the parties intended that No. 1 pears, exclusive of other grades, should be regarded as field run pears was a question of fact. Also, the question as to what the parties intended by the use of the words "if available" was a question of fact. ■ Defendant and his wife testified, as above stated, that defendant told Mr. Fisch, at the time the agreement was made, that he had made prior commitments for No. 1 pears and he would have to take care of those commitments first, and if he had the pears available he would sell to him; after the pears were processed there were only two grades of marketable pears, No. 1 and No. 3—only 32 tons of No. 3 (15 tons of which were sold to plaintiff and 17 tons were sold to Kern Food Products under a prior commitment). Mr. Fisch testified that defendant said that he was not sure how many tons of the specified field run pears he would have and he wanted to put the words "if available" in the contract. The evidence was sufficient to support the findings that defendant did not have available 50 tons or any other amount of field run pears; and that it was not within the contemplation of the parties that defendant would be required to deliver No. 1 pears in fulfillment of the agreement to deliver field run pears. Also, the evidence supports the other findings.

■ Appellant's counsel asserts that he did not complete his cross-examination of Mr. Vogel, under section 2055 of the Code of Civil Procedure, for the reason that the trial judge said, during that examination, that "It seems. perfectly obvious that they had 50 tons of field-run pears." Counsel asserts that by reason of said statement he was misled and prevented from having a fair trial, in that, he did not pursue further the question as to availability of the pears but proceeded to question the witness regarding damages. It appears that later in the trial (the next day), when appellant's counsel referred to said statement, the judge said that if he had made such a definite statement (as that referred to) he believed that he was wrong, and if appellant's counsel had

been misled he had permission to recall such witnesses as he thought proper to call in connection with that matter. Under the circumstances, it does not appear that reversible error was committed.

 Appellant also asserts that the judge was antagonistic and biased toward appellant's counsel after the judge had heard a remark of appellant's counsel, made in the hallway, to the effect that he thought that a ruling of the judge regarding the measure of damages was wrong. Appellant also asserts that a comment made by the judge, upon hearing counsel's remark, indicates that the judge had prejudged the case. After the judge had made the statement above-mentioned to the effect that the pears were available, he made a certain ruling regarding the measure of damages. Soon thereafter court adjourned, and while appellant's counsel and Mr. Fisch were in the hallway going toward the elevator appellant's counsel said that he thought that the ruling was wrong. The judge, who had just entered the hallway, said "I have heard that before." A few moments later the judge said: "Besides I have my doubts whether plaintiff is entitled to recover any damages at all." The last-mentioned comment of the judge should not have been made; however, it did not constitute reversible error.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.